## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JAMES THOR KIRK,

      Plaintiff,

v.                                  CV 12-1157 JAP/WPL

DOCTOR ROLANDO FLORES and
OFFICER JEFFREY BURKE,

      Defendants.

### PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

James Thor Kirk, a prisoner who has been incarcerated at two different New Mexico Corrections Department facilities over the past three and a half years, filed a revised amended complaint ("amended complaint") against Sergeant "Officer" Jeffrey Burke and Certified Nurse Practitioner "Doctor" Rolando Flores pursuant to 42 U.S.C. § 1983. Kirk alleges that following a car accident, Burke violated his Eighth and Fourteenth Amendment rights by detaining him for several hours in the back of a police car with no first aid care before driving him to the University of New Mexico Hospital ("UNMH") in white shorts and handcuffs. Kirk also alleges that Flores, a healthcare provider at the Valencia County Detention Center ("VCDC"), subsequently violated his Eighth and Fourteenth Amendment rights by delaying and denying adequate medical treatment. Kirk asserts that he was "comatose for several weeks and housed [in] unsanitary conditions with open wounds and broken bones." Kirk now claims that he has problems with his right hand and his brain. Both Burke and Flores have filed *Martinez* reports, each alleging entitlement to qualified immunity and asking the Court to grant summary judgment in their favor. Meanwhile, Kirk has also filed a motion to compel/consent order, a motion to

provide documents/evidence, and a motion requesting settlement and/or trials. Having considered the filings and the relevant law, and being otherwise fully advised in these matters, I recommend that the Court grant Defendants' summary judgment motions (Docs. 110-114, 121, 138) and deny Kirk's motion to compel/consent order (Doc. 26), his motion to provide documents/evidence (Doc. 27), and his motion requesting settlement and/or trials (Doc. 153).

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from events subsequent to a high speed police chase on October 26, 2010, resulting in Kirk crashing his vehicle at approximately ninety-five miles per hour outside of Los Lunas, New Mexico. The Los Lunas Police Department ("LLPD"), the New Mexico State Police ("NMSP"), and the Lincoln County Sheriff's Office ("LCSO") were involved in the chase, which according to an incident narrative by LLPD Officer Christopher Blea was initiated when Blea recognized Kirk as a driver who had fled the police the previous month. The details of the chase itself, which were captured by Burke's dashcam (*see* Doc. 112 Ex. B), are not relevant to the claims brought by Kirk. Nonetheless, I do note that the chase began in Los Lunas at approximately 12:25 p.m. and ended in Kirk's vehicle rolling multiple times at 1:00 p.m. on Highway 6 westbound near mile marker four, where police had arranged stop sticks. Burke's dashcam video reflects that Kirk swerved toward LCSO Officer David Thomas, who was standing outside of his vehicle, at approximately mile marker twenty-one, and that Kirk drove in the lane of opposing traffic for much of the chase, endangering other motorists. Kirk and his passenger, Stacy Gurule, can also be seen throwing small packages out of the vehicle windows.

Burke assumed the primary position in the police chase for the majority of the chase and was the first officer to reach Kirk and Gurule, followed shortly thereafter by NMSP Officer Paul Lopez. Gurule can be heard on video screaming and stating that she is pregnant as Burke helped

her from the vehicle. Kirk was ejected from the vehicle but is not visible on Burke's dashcam video. The video reflects officers interacting with a person on the ground on the side of the vehicle out of view of the dashcam. According to Burke's affidavit (*see* Doc. 114), he and Lopez used "distraction techniques"[1] to handcuff a resisting, combative Kirk, who had become conscious after a brief period of unresponsiveness. Packages of marijuana and heroin were also found at the scene.

The parties contest what happened next. While Kirk alleges in his complaint that Burke detained him for several hours in the back of his police car with no first aid and later brought him to the UNMH Emergency Room wearing nothing but white shorts and handcuffs, Burke states in his affidavit that after Kirk was placed in handcuffs, he was observed by other officers until an ambulance arrived and transported him on a gurney to the hospital. Burke claims that Kirk was never in his patrol car or any other patrol car. Unfortunately, Burke's dashcam video ends with Kirk apparently in handcuffs but still lying on the ground, having just been restrained.

Kirk was treated at UNMH for the surprisingly minor injuries he sustained in the crash. Doctors performed several CT scans and x-rays. Kirk was assessed with a second metacarpal shaft fracture of his right hand and ACL and MCL injuries to his left knee. (Doc. 138 Ex. D-4 at 1.) His right hand was placed in a splint, and he was referred to see Dr. Mercer at the General Orthopedic Hand Clinic on November 1, 2010, and the GOC Sports Clinic on November 26, 2010. (*Id.*) Kirk was also found to have small pulmonary contusions and facial and scalp lacerations. (Doc. 138 Ex. D-5 at 1.) He was placed on oxycodone for pain. (*Id.*)

---

[1] Burke's affidavit states that "[Lopez and I] positioned ourselves kneeling, one near Mr. Kirk's head and one at his torso, (I cannot remember which position I was in) and we physically moved his arms back and forth in random, fast, jerky motions to confuse the muscles and create a situation where constant force cannot be used by Mr. Kirk to resist against a constant force applied. My voice can be heard on the audio making grunting type noises as this technique is being employed, as a further element of this unarmed distraction technique." (*Id.*)

Meanwhile, Kirk was charged with attempted murder in the first degree, aggravated assault, aggravated fleeing from an officer, distribution of a controlled substance, possession of a controlled substance, aggravated DWI, reckless driving, resisting, evading or obstructing an officer, and open container.[2] (Doc. 110 at 9-10; Doc. 111 Ex. A at 6-7.) After treatment at UNMH, Kirk was transported to the VCDC on October 27, 2010.

Kirk filed a complaint alleging Eighth and Fourteenth Amendment claims pursuant to 42 U.S.C. § 1983 against UNMH, the VCDC, and Valencia County Medical Care.[3] The Court dismissed all three defendants—UNMH because, as an arm of the state, it is not a "person" for purposes of § 1983, and the other two defendants because Kirk failed to allege that the actions of the employees of these entities were taken pursuant to customs or policies established by their employers. The Court provided leave for Kirk to amend his complaint to make allegations against specific individual defendants.

Kirk filed two amended complaints, the second of which—Doc. 53—is the active complaint in this case. Kirk included both new and previously dismissed defendants. The Court declined to reinstate the three previously dismissed defendants and dismissed claims against several newly named entities, leaving Burke and Flores as the only remaining defendants. The Court provided that no further amendments to the complaint would be considered except by prior order of the Court.

Kirk organized his complaint pursuant to the "nature of the case" and three "claims." Regarding the nature of the case, Kirk states that an accident occurred on October 26, 2010, and

---

[2] Kirk entered a plea of no contest to the first three counts against him on or about September 5, 2013, and the prosecutor dismissed the remaining counts. (*See* Doc. 112 Ex. D at 2.) However, he filed a motion to withdraw the plea on October 16, 2013, and that motion is still pending in state court. (*See id.* at 1-2.)

[3] Kirk filed a first "amended complaint" on December 11, 2012, effectively bringing the same claims.

Burke transported him to the UNMH in handcuffs without an ambulance. He also claims that Flores delayed and denied adequate treatment at the VCDC, leaving him comatose for weeks in unsanitary conditions with open wounds and broken bones. As to his three claims, Kirk first alleges violations of "Rights under the Eighth and Fourteenth Amendments. Also New Mexico Department of Health Intake, Processing and Training Requirements. General Provisions. The Complaint seeks damages." He provides no supporting facts. Kirk's second claim asserts a violation of "New Mexico Department of Health, Intake, Processing and Training Requirements. General Provisions." As supporting facts, Kirk states that he suffered "multiple lacerations, contusions and fractures." He claims that head injuries were apparent due to lacerations on the head and that there was a major breach of emergency protocol for failure to stabilize his head and spine. Kirk alleges that his mother has statements from hospital staff that an officer brought him to the emergency room in handcuffs and white shorts. He states that the VCDC failed to provide him with adequate treatment, causing "significant remodeling of the corpal meta corpols [sic] and phalanges of the right hand causing pain, loss of motor function, dexterity and flexability [sic], and there is damage to the motor function and speech pathways of the memory center of the brain." Kirk requests that the Court order an orthopedic or "nuero specialist" evaluation. Finally, for Kirk's third "claim," he names "Doctor Martha, Cibola County Detention Center."[4] For supporting facts, Kirk asserts that Doctor Martha stated that the Court will have to order an orthopedics and "nuero specialist" to examine and treat his injuries because, due to his

---

[4] While Kirk was originally incarcerated at the VCDC, he notified the Court on December 13, 2012, that he had been transferred to the Cibola County Detention Center. On July 2, 2013, Kirk notified that Court that he was transferred back to the VCDC. On April 4, 2014, Kirk notified the Court that his new address is now a P.O. Drawer for prisoners in Los Lunas, presumably indicating that he was still incarcerated at VCDC, which is located in Los Lunas. Finally, on April 21, 2014, Kirk notified the Court of a change in address to a P.O. box in Santa Rosa, NM.

incapacitation, they are obligated to treat his serious medical conditions. Kirk includes a few other allegations throughout as to parties that were previously dismissed.

Throughout the pendency of this case, Kirk has also filed many frivolous and procedurally inappropriate motions as well as hundreds of pages of duplicative medical and legal records. He has attempted to amend or supplement his complaint without leave of the Court and to join his passenger, Stacy Gurule, in the action without her written consent. I struck a surreply to Flores's *Martinez* report and advised Kirk to follow the Federal Rules of Civil Procedure and the Court's orders as well as to refrain from sending duplicative filings that only delay the resolution of his case.

## STANDARD OF REVIEW

The Court should grant summary judgment only when the record demonstrates "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* A mere "scintilla" of evidence is insufficient to successfully oppose a motion for summary judgment. *Id.* at 252. The record and all reasonable inferences therefrom must usually be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000). I will therefore view the facts in the light most favorable to Kirk.

For purposes of summary judgment, a prisoner's complaint is treated as an affidavit if it alleges facts based on his personal knowledge and has been sworn under penalty of perjury. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). A *Martinez* report is also treated as an

affidavit and may be construed as a motion for summary judgment. *Id.* at 1109-13; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986). A court cannot resolve material disputed factual issues by accepting a *Martinez* report's factual findings when they are in conflict with pleadings or affidavits. *Hall*, 935 F.2d at 1109. However, conclusory allegations without specific supporting facts have no probative value and cannot create a genuine issue of fact. *See Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005); *Annett v. Univ. of Kan.,* 371 F.3d 1233, 1237 (10th Cir. 2004); *Ledoux v. Davies*, 961 F.2d 1536, 1537 (10th Cir. 1992).

As to the qualified immunity bar asserted in this case, the purpose of this doctrine is to shield government officials from suit so that "bare allegations of malice [do] not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982). Qualified immunity is broad and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 55 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). When a defendant moves for summary judgment on the basis of qualified immunity, it is the plaintiff's burden to show that: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Furthermore, "[i]f, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he . . . is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

Because Kirk proceeds *pro se*, I construe his pleadings liberally and hold them to a less stringent standard than is required of a party represented by counsel. *See Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1029 (10th Cir. 2008) (citing *Hall*, 935 F.2d at 1110). Liberal construction requires courts to make some allowance for a *pro se* litigant's "failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements[.]" *Garrett v. Selby, Connor, Maddox & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) (quoting *Hall*, 935 F.2d at 1110) (alterations omitted). However, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Id.*

**DISCUSSION**

Burke and Flores each filed their own separate *Martinez* reports with their own arguments. Therefore, I address each Defendant individually, beginning with arguments from each respective *Martinez* report and followed by analyses incorporating Kirk's manifold submissions to the Court. I also address Kirk's Motion to Compel/Consent Order (Doc. 126), Motion to Provide Documents/Evidence (Doc. 127), and Motion Requesting Settlements and/or Trials: Set Trial Dates (Doc. 153).

**I.      Burke**

   A.   <u>Arguments Presented in the *Martinez* Report</u>

In his *Martinez* report, Burke states that pursuit ended at approximately 1:00 p.m. He references documents from Living Cross Ambulance Service ("Living Cross") that indicate that an ambulance was dispatched at 1:02 p.m., arrived at 1:24 p.m., began treatment at 1:28 p.m., transported Kirk from the scene at 1:45 p.m., and arrived at UNMH at 2:03 p.m. Burke asserts that no police officer moved Kirk after he was placed in handcuffs; rather, Kirk was not moved

8

until paramedics arrived, immobilized his spine, placed him on a gurney, and transported him to UNMH, where he was released early in the morning on October 27, 2010.

Burke provides several defenses to Kirk's allegations. First, he states that Kirk has failed to state a claim upon which relief can be granted. Burke argues that Kirk's claims are conclusory and completely contradicted by the actual facts reflected by multiple sources. Burke also points out that Claim III is not directed at him and instead focuses on the treatment of Kirk's injuries upon incarceration. He argues that Claim II is uncertain and vague, invoking the New Mexico Department of Health Intake, Processing and Training Requirements, though these regulations apply only to certain health care facilities and not to police officers. Furthermore, he notes that Claim I fails to allege any facts. Burke argues that even if Kirk's supporting facts for Claim II were to be applied to Claim I, Kirk failed to state a claim under the Eighth and Fourteenth Amendments. Burke asserts that Kirk has failed to show, based on the irrefutable facts, that he exhibited a "deliberate indifference to serious medical needs." According to Burke, "[Kirk] cannot satisfy the threshold requirements of his claim because none of the facts he alleges actually occurred."

As such, Burke uses Kirk's purported failure to state a claim for a constitutional violation as support for the presumption that as a state police officer, he is entitled to qualified immunity. Burke argues that Kirk cannot show that he knew Kirk faced a substantial risk of harm and disregarded that risk by failing to take reasonable measures to abate it. Burke states, "[T]he undisputed facts demonstrate that Officer Burke did not violate Plaintiff's rights in any way. . . . Given that Kirk's factual claims are shown to be entirely false, Officer Burke is entitled to assert this immunity from suit."

In addition to his primary arguments, Burke contends that Kirk is barred from relief based on the equitable doctrine of unclean hands. As grounds for this affirmative defense, Burke states that none of the alleged facts occurred, and perjury or fraud on the court will bar relief. In addition, Burke argues that any injuries sustained by Kirk "existed prior to (and without aggravation by) any conduct or action of Officer Burke."

    B.  <u>Analysis</u>

As noted, Kirk brings three "claims" in this case. Claim III is simply Kirk's interpretation of a medical opinion of Dr. Martha from the Cibola County Detention Center. I will not discuss this "claim" because it is not a claim against Burke. In addition, while Kirk lists "New Mexico Department of Health Intake, Process and Training Requirements" under Claims I and II, the scope of the provisions are limited to certain health organizations and do not apply to police officers. (*See* Doc. 118 at 3.)

As to Kirk's claims that could apply to Burke, because Burke argues that he is entitled to qualified immunity, I must determine whether Kirk has met his burden of showing that Burke violated a constitutional right and that the right was clearly established. *Martinez*, 563 F.3d at 1088. In the Tenth Circuit, a right is clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" indicates that such a right is clearly established. *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

Because Kirk had not been convicted of any crime relating to the events on October 26, 2010, at the time of Burke's alleged several-hour detention of Kirk in the back of his police car with no first aid, he was a pretrial detainee not subject to the protections of the Eighth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Nonetheless,

government officials must comply with the protections of the Fourteenth Amendment's Due Process Clause with respect to a pretrial detainee, including providing medical care to one "injured while being apprehended by the police." *Id.* "The Tenth Circuit has held that 'pretrial detainees have essentially the same rights under the due process clause of the Fourteenth Amendment as convicted prisoners have under the Eighth Amendment.'" *Todd v. Montoya*, 877 F. Supp. 2d 1048, 1092 (D.N.M. 2012) (citing *Bauer v. Dantis*, 77 F.3d 492, at *1 n.1 (10th Cir. 1996) (unpublished table decision)). Thus, I still analyze Kirk's claims according the requirements of the Eighth Amendment, as applied pursuant to the Due Process Clause of the Fourteenth Amendment, to determine whether Kirk has satisfied the first prong of the qualified immunity test.

A government official violates clearly established Eighth Amendment rights "if he acts with deliberate indifference to an inmate's serious medical needs—and if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Garrett v. Stratman*, 254 F.3d 946, 949 (10th Cir. 2001) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). A plaintiff must satisfy both objective and subjective components. *Id.* "The objective component is met if the deprivation is sufficiently serious." *Id.* (quoting *Sealock*, 218 F.3d at 1209). "[A] medical need is considered sufficiently serious if the condition has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)) (internal quotations omitted). Furthermore, if the deprivation alleged is a delay in medical treatment, the delay must result in substantial harm: "lifelong handicap, permanent loss, or considerable pain." *Id.* at 950 (quoting *Oxendine*, 241 F.3d at 1278). The Tenth Circuit has held that the pain and suffering an inmate experienced for several

hours while feeling that he was having a heart attack (and turned out to actually be having a heart attack) before officials provided him with medical care constituted substantial harm satisfying the objective component of an Eighth Amendment violation. *Sealock*, 218 F.3d at 1210.

The subjective element, requiring "deliberate indifference," is shown where the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Garrett*, 254 F.3d at 949 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The factfinder in the case determines whether the official had knowledge of the substantial risk and may make this determination based on circumstantial evidence, the obviousness of risk, and other factors. *See id.* at 950.

In a qualified immunity case such as this, the Court should usually adopt the plaintiff's version of the facts for the purpose of determining whether a constitutional violation occurred. *See Scott v. Harris*, 550 U.S. 372, 378 (2007). Nonetheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. In *Scott*, the Court adopted the facts as depicted by a videotape of a high-speed police chase rather than the facts as described by the plaintiff because the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him." *Id.* That is, the nonmovant must show more than "some metaphysical doubt as to the material facts." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

As to Kirk's Eighth and Fourteenth Amendment claims, I construe his pleadings liberally and apply the facts under Claim II and the nature of the case to support the Eighth and Fourteenth Amendment claims under Claim I. While Burke argues that Kirk has failed to state a

claim under the Eighth and Fourteenth Amendments, he states conclusorily that Kirk's alleged facts are insufficient to state a claim and that Kirk cannot satisfy the threshold requirements of an Eighth Amendment claim because the facts alleged did not actually occur. Construing Kirk's pleadings liberally, his alleged facts appear to state both objective and subjective elements required under the Eighth Amendment. Because Burke's first line of reasoning lacks explanation for why the facts alleged do not state a claim and his second line of reasoning invokes the record, I will analyze the record as a whole and determine whether Burke is entitled to summary judgment.

Most importantly, I note Kirk's failure to provide any evidence beyond his pleadings signed under penalty of perjury to support his position that he was taken to UNMH in the back of Burke's police car several hours after the accident. For example, despite Kirk's claim that his mother heard from UNMH staff that he was brought in handcuffs by an officer to the hospital, the record does not contain any affidavits or other evidence to support this contention. Instead, Kirk points out, often through annotations on medical and other records, perceived defects that he asserts indicate the fabrication of evidence against him. In contrast, the *Martinez* report reveals via multiple different disinterested sources a timeline of events reflective of Burke's arguments.

Three distinct sources indicate that Kirk was treated by medical personnel at the scene and transported to UNMH by ambulance: police reports, ambulance records and a paramedic affidavit, and hospital records. Officer Lopez's incident report states that "I stayed with Mr. Kirk until medical personnel arrived on scene and began treating him." (Doc. 110 Ex. A at 9.) Police dispatch records from October 26, 2010, indicate an officer stating at 1:48 p.m.: "I will be following the male subject to UNMH." (*Id.* at 21.)

Paramedic Kevin Druce provided an affidavit stating the following regarding the accident involving Kirk:

> As the documents show, we were dispatched to the scene at 1:02 p.m. and arrived at 1:24 p.m. . . . At no time did I see Mr. Kirk in the back of a patrol car or hear anyone say that Mr. Kirk had been [in] the back of a patrol car following the accident. We rendered emergency first aid to Mr. Kirk as shown in the attached report, including stabilizing his neck, and we transported him via ambulance to UNM Hospital, leaving the scene at 1:45 p.m. and arriving at the hospital at 2:03 p.m.

(Doc. 113 Ex. E at 1-2.) The attached claim detail report from Living Cross reflects the times indicated in Druce's affidavit. (*Id.* at 3.) Living Cross's export detail report further states that Kirk was placed on a spine board and transported in a gurney. (*Id.* at 5.) The EMS Service Report states that Kirk "[d]oes not remember accident." (*Id.* at 7.) Finally, Living Cross's ambulance bill indicates that the "Origin Address" was "Pickup From Scene." (*Id.* at 10.)

UNMH records also indicate that Kirk arrived for treatment shortly following the accident. Nursing notes indicate that Kirk was removed from the backboard at 2:39 p.m. on October 26, 2010. (Doc. 138 Ex. D-3 at 3.) He was taken for a CT scan at 2:42 p.m. (*Id.*) An emergency trauma order reflects that Kirk was provided medication at 2:44 p.m. (Doc. 138 Ex. D-3 at 2.) A radiograph of Kirk's pelvis and chest were taken at 2:46 p.m. (Doc. 138 Ex. D-4 at 8-9.) A CT scan of Kirk's cervical spine was taken at 3:05 p.m., of his head at 3:06 p.m. (*Id.* at 10, 12), and of his chest, abdomen, and pelvis at 3:09 p.m. (Doc. 138 Ex. D-5 at 5.) At 3:45 p.m., Sean Kuehn, M.D., examined Kirk for neck, chest, and back pain. (Doc. 138 Ex. D-4 at 14-15.) Jeffrey Jobe, M.D., examined Kirk's right hand at 6:37 p.m. (*Id.* at 3-5.) Dr. Jobe noted that "[t]he patient denies that he knows how he ended up here but the officer reports there was an automobile roll-over in Las [sic] Lunas." (*Id.* at 3.) Radiographs were taken of Kirk's right hand at 7:04 p.m. (Doc. 138 Ex. D-5 at 7) and at 11:31 p.m. (*id.* at 10) and of his left knee at 11:37

p.m. (*id.* at 8). UNMH provided Kirk with prescriptions at 1:11 a.m. on October 27, 2010. (*Id.* at 12-13.)

Kirk responds by attempting to prove the falsity of the documents showing that he was taken to UNMH by medical personnel who arrived promptly at the scene of the accident. He underlines that Druce is a "former" employee of Living Cross. (Doc. 124 at 2.) Kirk points to a "crooked" line on the police dispatch report, claiming that this indicates that the report was "fabricated." (*See* Doc. 119 at 8.) Kirk also tries to show time discrepancies in the record to discredit Burke's version of the events. Kirk points out that Burke's *Martinez* report states that Burke began pursuit of Kirk at 3:20, according to his dashcam. (Doc. 123 at 1; *see* Doc. 110 at 3.) A look at Burke's dashcam video indicates that the pursuit does begin at 3:20 a.m. according to the dashcam time stamp. (*See* Doc. 112 Ex. B.) However, the time stamp also incorrectly says October 25, 2010, and it is obvious that the video was taken during broad daylight rather than during the early hours of the morning. (*See id.*) Kirk fails to show that this discrepancy is anything other than a dashcam clock error.

Next, Kirk states that the warrant for his arrest on October 26, 2010, "evidences fabrication of this report and warrent [sic]." (Doc. 123 at 2.) Kirk claims that because he was not the actual owner of the vehicle he crashed, it would have been impossible for there to be a warrant for his arrest for previously fleeing from the police in that vehicle. (*Id.*) However, Kirk fails to note that the affidavit for arrest warrant is dated October 26, 2010, at 11:19 p.m.—after the crash and after police ascertained Kirk's identity. (*Id.*) Kirk also notes several instances in the dashcam video where the audio cuts out and argues that this indicates tampering with evidence. (*Id.* at 3-4.) Unfortunately, the dashcam video ends about the time Kirk was placed in handcuffs, while his claims deal with his treatment thereafter. The gaps in audio do not cover evidence

15

relevant to this case. Kirk emphasizes as well the fact that a helicopter came to take his passenger for emergency treatment but left him at the scene. (*Id.* at 2.) He suggests that he was not taken in the helicopter because he was in the police car. (Doc. 132 at 4.) Finally, Kirk provides his UNMH Patient Property List for October 26, 2010, which indicates that Kirk brought in one pair of underwear to the hospital. (Doc. 132 at 11.)

As evidenced by the differences between Kirk's allegations and the record, the possible facts are highly conflicting. Despite the Court's practice of treating the facts in the light most favorable to the nonmoving party at the summary judgment stage, I consider whether this is a case where the plaintiff's allegations are blatantly contradicted by the record, instead construing the facts as to the events following the handcuffing of Kirk to his treatment at UNMH in the light depicted by the police, ambulance, and hospital records. While the pertinent events in *Scott* were all captured on videotape, and the videotape blatantly contradicted the petitioner's allegations, there is no indication that a videotape is required to constitute blatant contradiction. *See Scott*, 550 U.S. at 380. "[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record . . . ." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).[5] The Tenth Circuit has found at the opposite end that where contradictory evidence only includes other witnesses' testimony, this does not constitute blatant contradiction of the plaintiff's allegations. *See Rhoads v. Miller*, 352 F. App'x 289, 291 (10th Cir. 2009) (unpublished) ("Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony."). In *Robles*, the court similarly found that officers' police reports and dispatch records alone did not establish blatant contradiction of the

---

[5] Tenth Circuit Judge Jerome Holmes concurred, stating that "in the qualified immunity context . . . the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court." *Id.* at 1326 (Holmes, J., concurring).

plaintiff's contentions. *Robles v. Schultz*, No. CIV 08-0438 JB/KBM, 2010 WL 1441287, at *18-20 (D.N.M. March 15, 2010) (unpublished).

This case, while not including a videotape of the relevant events, does appear to involve "similar evidence" that may be used to blatantly contradict Kirk's allegations. Where police reports from police not involved in this case, ambulance reports, a paramedic's affidavit, and extensive hospital records all reflect that Kirk was rapidly reached by medical personnel and transported for further treatment at UNMH after the accident, no reasonable jury could find that Kirk was stuck in the back of a police car for hours with no first aid. The record blatantly contradicts Kirk's assertions.[6]

After finding that the record blatantly contradicted the plaintiff's allegations, the Court in *Scott* found that "view[ing] the facts in the light depicted by the videotape . . . it is quite clear that [the police officer] did not violate the Fourth Amendment." 550 U.S. at 381. Likewise, construing the facts pertinent to Kirk's claims against Burke in the light reflected by the police records, ambulance records, paramedic affidavit, and hospital records, I find that Burke did not violate Eighth or Fourteenth Amendment rights. As Kirk's only allegations are such that no reasonable jury could find that they occurred, he cannot establish a violation of the Eighth or Fourteenth Amendments. Because Kirk has failed to establish the first prong of the qualified immunity test, I recommend that the Court find that Burke is entitled to qualified immunity and grant summary judgment in his favor.

**II.    Flores**

A.   Arguments Presented in the *Martinez* Report

---

[6] While I find it odd that hospital records only specifically indicate that Kirk had underwear in his possession when he entered the hospital on October 26, 2010, there is nothing to connect this record to any actions by Burke, including either keeping him in the back of his police car for several hours or denying first aid. (*See* Doc. 132 at 11.)

Flores concedes that this Court will likely find him, a private certified nurse practitioner who subcontracted to perform medical services at the VCDC until October 2012, to be a state actor subject to suit under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42 (1988). The Court held, "Respondent, as a [private] physician employed by North Carolina to provide medical services to state prison inmates, acted under color of state law for purposes of § 1983 when undertaking his duties in treating petitioner's injury. Such conduct is fairly attributable to the State." *Id.* at 54. As Flores was a private healthcare provider subcontracted to provide inmate health services, I do treat him as a state actor for purposes of this lawsuit.

Flores then outlines the requirements that Kirk must meet to allege an Eighth Amendment claim. In addition to the general standards previously discussed in these proposed findings, he points out that an "inadvertent failure to provide medical care or an act of mere negligence does not violate the Eighth Amendment." (Doc. 121 at 5 (citing *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006); *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006)).

Flores's first argument is that the allegations contained in Kirk's amended complaint do not rise to the level of an Eighth Amendment violation—that is, a failure to state a claim. Flores asserts that the only claim specifically against him is that he "delayed and denied adequate treatment." Flores argues that Kirk failed to provide facts to support the allegation that Flores knew that Kirk was comatose for several weeks and housed in unsanitary conditions with open wounds and broken bones. He contends that he had no role in inmate housing assignments. Furthermore, Flores states that Kirk's comments about abnormalities in his right hand and "damage to the motor function and speech pathways of the memory center of the brain" are merely self-serving with no supporting facts and "fail[] to allege a causal connection between

18

Defendant Flores' alleged delay and denial of medical care and the self-identified injury." Flores argues that Kirk has failed to demonstrate any facts indicating that any delay in treatment caused substantial harm and that therefore the amended complaint should be dismissed.

Flores next argues that "[t]he records obtained to date do not support the existence of a significant medical condition which would pose a serious risk to Plaintiff's health if care were delayed or denied." Flores summarizes doctors' findings at UNMH immediately after the accident, pointing out that after several CT scans, there was no evidence of significant injury. Kirk only had "a mildly comminuted fracture of the mid second metacarpal diaphysis . . . with mild ventral angulation of the distal fracture fragment." Kirk's hand was placed in a splint, and this reduction of the "second metacarpal fracture show[ed] improved alignment. No other acute abnormality [was] evident." Referring once again to the amended complaint, Flores states that Kirk provides no information as to what medical care was purportedly "delayed and denied." He notes that Kirk handwrote on a medical record that "Valencia County Detention Center medical service Dr. Roland Flores and Administrators did not meet Appointment 11/01/10 with Dr. Mercer," but argues that even if this were the basis for Kirk's complaint, "there are no facts indicating Defendant Flores knew of the referral, that he knew there was an excessive risk to Plaintiff's health or safety if the appointment was not kept, or that he deliberately chose to disregard the risk." Further, Flores argues that Kirk did not provide evidence of a medical condition so severe that a lay person would recognize the need for medical attention. Finally, he asserts that the amended complaint does not show that the failure to make Kirk's orthopedic visit with Dr. Mercer resulted in exacerbating his condition.

Third, Flores argues that the amended complaint does not sufficiently inform him of the claims against him and therefore should be dismissed. As support, Flores contends that Kirk "did

not allege any facts which would inform Defendant Flores of the when, where, and how he supposedly delayed and denied medical care." Flores claims that he "should not be in a position of guessing about what he did or failed to do, or drawing conclusions from handwritten notes on a medical record."

Flores argues lastly that he is entitled to qualified immunity. He refers to his prior arguments, claiming that because Kirk has failed to allege specific conduct establishing deliberate indifference to a serious medical need, Kirk has not established a violation of the Eighth Amendment right to be free from cruel and unusual punishment.

B.  Analysis

As discussed with regard to Burke, Kirk brings three "claims." Again, Claim III is merely Kirk's interpretation of Dr. Martha's medical opinion and does not state a claim against Flores. With respect to Kirk's claims pursuant to the New Mexico Department of Health Intake, Processing and Training Requirements, his amended complaint does not specify which provisions he believes were violated. However, Kirk annotated the provisions in one of his responses, and his apparent allegations are that the VCDC has an inadequate medical department—"no infirmary"—and that no incident report forms were provided. (*See* Doc. 118 at 6.) Kirk does not specifically state a claim against Flores. Further, the Court has already dismissed the VCDC as a defendant (*see* Doc. 63 at 4), and the provisions marked by Kirk only apply to "community based service providers," which do not include prison health facilities (*see* Doc. 118 at 3, 5). Therefore, I look once again at the Eighth and Fourteenth Amendment violations asserted by Kirk, and I liberally construe the pleadings to include the alleged facts in the nature of the case and Claim II to apply to Claim I.

Because Flores argues that he is entitled to qualified immunity, I must determine whether Kirk has met his burden of showing that Flores violated a constitutional right and that the right was clearly established. *Martinez*, 563 F.3d at 1088. As Kirk did not enter his plea of no contest until September 5, 2013, and Flores's contract to treat patients at the VCDC ended in October 2012, Kirk's claims apply to his time as a pretrial detainee, and I will therefore examine Kirk's claims under the Fourteenth Amendment Due Process Clause rather than directly under the Eighth Amendment. *See Revere*, 463 U.S. at 244.

Even at the summary judgment stage, a defendant's arguments that are "based solely on the sufficiency of the allegations in the complaint" may be treated as a motion to dismiss for failure to state a claim. *Fields v. Wise Media,* LLC, No. C 12-05160 WHA, 2013 WL 3812001, at *4 (N.D. Cal. July 19, 2013) (unpublished) (citing *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968)). I previously discussed the general requirements to allege an Eighth Amendment violation in my analysis of Kirk's claims against Burke. In the healthcare provider context,

> a complaint that a [healthcare provider] has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.[7] In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Such deliberate indifference must include the "unnecessary and wanton infliction of pain," whether by a healthcare professional or prison official. *Estelle*, 429 U.S. at 104. In *Fitzgerald*, the court granted summary judgment as to the defendant doctor

---

[7] A prisoner's medical malpractice claims would likely constitute torts under state law. *See Estelle*, 429 U.S. at 107.

because the doctor's conduct, as alleged by the prisoner, did not rise to the level of an Eighth Amendment violation. *Id.* The court stated, "The conduct of [the doctor], as alleged, did not amount to an act or omission sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* (quotations omitted).

Similarly, Flores argues that Kirk's allegations do not rise to the level of an Eighth Amendment violation. A petitioner must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." *Id.* That is, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

While Kirk alleges that he was comatose for several weeks and housed in unsanitary conditions with open wounds and broken bones, he does not allege any facts to support that Flores was aware of Kirk's housing situation or medical condition at any specific time. Nor has Kirk alleged that his purported "pain, loss of motor function, dexterity and flexibility" were caused by the deliberate indifference of Flores. In fact, Kirk does not allege any particular act or omission whatsoever by Flores, except for claiming that Flores "delayed and denied adequate treatment." As in *Fitzgerald*, the alleged conduct of the defendant healthcare provider does not "amount to an act or omission sufficiently harmful to evidence deliberate indifference to serious medical needs." 403 F.3d at 1143. I therefore conclude that Kirk has failed to state a claim upon which relief may be granted.

In the Tenth Circuit, there is a preference to provide leave to amend the complaint where the Court dismisses a *pro se* prisoner's petition on the sole basis that he or she failed to state a claim and where the prisoner may be able to correct a defect in the pleading caused by ignorance of pleading requirements. *See Reynoldson v. Shillinger*, 907 F.2d 124, 126 (10th Cir. 1990). However, because the *Martinez* report and submissions by Kirk already contain the relevant evidence as to Flores regardless of whether Kirk's claim was properly pled, I proceed instead to analyze whether Kirk has shown at the summary judgment stage an Eighth or Fourteenth Amendment violation that is clearly established. *See Hall*, 935 F.2d at 1110-11. In doing so, I construe the facts as to the claims against Flores in the light most favorable to Kirk. *See Thomson*, 584 F.3d at 1318.

Through various filings, lengthy exhibits, and medical records, Kirk provides several clues as to how Flores might have "delayed and denied adequate treatment." As noted by Flores, Kirk handwrote the following on orthopedic consultation notes from UNMH recommending a follow-up with the General Orthopedic Hand Clinic: "Valencia County Detention Center medical service Dr. Roland Flores and Administrators did not meet Appointment 11/01/10 with Dr. Mercer? inadequate medical treatment." (Doc. 121 Ex. C at 11.) As to his mid second metacarpal, Kirk wrote that it "needs reconstructed." (*Id.* at 4.) During a visit with Flores on January 27, 2011, Kirk demanded to have a CT scan because of his headaches and because he believed that he should not have been discharged from UNMH so soon. (Doc. 138 Ex. D-9 at 8.) Flores noted that Kirk was a "[v]ery angry man." (*Id.*) Flores wrote that he did not see anything to substantiate the need for a CT scan or MRI at the time, and he tried to assure Kirk of the "benign presentation," yet Kirk became increasingly angry and loud. (*Id.*) Flores prescribed naproxen and methocarbamol. (*Id.*) Kirk again demanded a CT scan and complained of migraine

headaches during a visit with Flores on April 22, 2011. (Doc. 138 Ex. D-10 at 15.) Flores found no neurological deficits and prescribed Inderol for the migraine headaches. (*Id.*)

After Flores stopped treating patients at the VCDC, Kirk continued to see other healthcare providers there. On February 20, 2014, Kirk notified the Court that "Dr. Leona" at the VCDC ordered a checkup, including bloodwork and a CT scan. (Doc. 139 at 1.) On February 27, 2014, Kirk updated the Court that he was still awaiting his CT scan and blood tests at UNMH. (Doc. 141 at 1.) On March 11, 2014, the VCDC responded to an inmate grievance, stating that it would schedule Kirk for labs and a neuro evaluation at UNMH. (Doc. 150 at 4.) Thus, between the amended complaint and the record as a whole, it appears that Kirk's complaint may derive from three matters: 1) his living conditions and medical treatment immediately after the accident, 2) his dissatisfaction with not being taken to the General Orthopedic Hand Clinic for his follow-up visit, and 3) Flores's refusal to refer him for a CT scan.

As to the first matter, Flores points out that he is entitled to summary judgment because it is undisputed that Flores played no role in inmate housing assignments, that Flores had no personal knowledge that Kirk was allegedly comatose for several weeks while housed in unsanitary conditions with open wounds and broken bones, that Flores worked as a sub-contractor for the entity which contracted with the VCDC to provide medical services, and that Flores had no decision-making authority as to when an inmate would be seen by healthcare providers. (Doc. 147 at 4-5.) Furthermore, the record reflects that except for an intake visit on October 27, 2010, at which Flores prescribed ibuprofen and flexeril for pain management after noting multiple bruises and lacerations and Kirk's hand splint and knee brace (*see* Doc. 138 Ex.

D-6 at 8-9),[8] Flores did not see Kirk again until January 22, 2011 (*see* Doc. 138 Ex. D-9 at 4). During the interim, Kirk was seen by other healthcare providers on November 8, November 15, December 8, and December 22. (*See* Doc. 138 Ex. D-7, D-8.) Kirk was on suicide watch until November 15, 2010, at which time he was cleared for housing with the general population. (Doc. 138 Ex. D-7 at 5.) On December 8, 2010, Kirk was provided with warm compresses, thermal underwear, and additional medication. (*Id.* at 6.) The healthcare provider also noted that his right hand metacarpal dislocation was not interfering with function. (*Id.* at 15.)

On these facts, taken in the light most favorable to Kirk, Kirk has failed to show an Eighth or Fourteenth Amendment violation by Flores. Even assuming that Kirk was in considerable pain from his headaches and his injuries sustained in the automobile accident, there is no indication of delay in care. Yet even if there was a delay in care, even more pronounced is the lack of evidence of deliberate indifference by Flores. Flores examined Kirk the day after the accident and prescribed a pain management regimen. (*See* Doc. 138 Ex. D-6 at 8-9.) "A mere difference of opinion between a prisoner and the prison's medical staff with respect to a diagnosis or a plan of treatment, or a mere medical difference of opinion, is not actionable under the Eighth Amendment." *Phillips v. Tiona*, 508 F. App'x 737, 746 (10th Cir. 2013) (unpublished) (citing *Estelle*, 429 U.S. at 107). The Tenth Circuit has found in a similar case that

> [the healthcare provider] cleansed [the inmate's] wound, bandaged it, twice provided him pain relievers, and encouraged him to rest. [The inmate] disagrees that this amount of treatment was proper, but such a claim is not sufficient to suggest a constitutional violation, much less deliberate indifference. At best, his allegations point to negligence, which is insufficient to support an Eighth Amendment claim.

*Sanaah v. Howell*, 384 F. App'x 737, 741 (10th Cir. 2010) (unpublished).

---

[8] Flores appears to not remember whether he was the healthcare provider who performed the intake exam on Kirk on October 27, 2010 (*see* Doc. 147 at 4), but the records reflect that he performed that examination.

With respect to the missed appointment with the General Orthopedic Hand Clinic on November 1, 2010, Kirk has provided no evidence that anything more than negligence on the part of someone at the VCDC caused the absence. Nor has he shown that it was Flores's duty to ensure that Kirk made it to his appointment. Furthermore, there is no evidence from which the inference could be drawn that a substantial risk of serious harm existed and that Flores drew this inference. *See Sealock*, 218 F.3d at 1210. Even if Kirk was experiencing "pain, loss of motor function, dexterity and flexibility," neither medical reports nor Kirk's medical treatment requests reflect a substantial risk of serious harm. After his hand was placed in a splint at UNMH, radiologist Jennifer Ann Johnson, M.D., described "[a] mildly comminuted fracture of the mid second metacarpal diaphysis . . . visualized with mild ventral angulation of the distal fracture fragment. . . . [T]he second metacarpal fracture shows improved alignment. No other acute abnormality is present." (Doc. 138 Ex. D-5 at 10.) On December 8, 2010, nurse practitioner Debra Stangu examined Kirk at the VCDC and found multiple soft tissue injuries and "right hand metacarpal dislocation not interfering with function." (Doc. 138 Ex. D-7 at 15.) Thus, neither healthcare provider suggested Kirk faced a substantial risk of serious harm.

Even Kirk himself did not emphasize to healthcare providers at the VCDC that his hand was giving him significant problems. Stangu's evaluation stemmed from a visit arranged after Kirk complained of "a very bad car accident causing 1) a dislocated shoulder, 2) broken ribs, 3) broken right hand, 4) broken or fractured left leg, [and] 5) and serious trauma to [the] skull." (Doc. 138 Ex. D-7 at 11.) On January 25, 2011, Kirk wrote on a VCDC Medical Services Request Form that he was having poor circulation and numbness in his right hand. (Doc. 138 Ex. D-9 at 6.) However, there is no evidence that Kirk ever discussed his hand with Flores when he was seen two days later; the medical records only indicate that Kirk asked for an evaluation of

his headaches. (Doc. 138 Ex. D-9 at 8.) Finally, Flores noted on February 10, 2011, that Kirk had

right wrist pain, and he prescribed Inderol and naproxen. (Doc. 138 Ex. D-9 at 14.) From the

time of Kirk's intake examination on October 27, 2010, to his last visit with Flores on June 23,

2012, Flores alone saw Kirk ten times, and Kirk submitted over two dozen requests for health

care, with only the few instances noted referencing the right hand. (*See* Doc. 138 Exs. D-7-D-

11.) Viewing the facts in the light most favorable to Kirk, he has failed to show either that there

was a serious deprivation with respect to his hand or that Flores treated it with deliberate

indifference.

Finally, it is clear from the record that Kirk demanded a CT scan, but Flores determined

that his symptoms did not warrant one and instead prescribed medication. (*See* Doc. 138 Ex. D-9

at 8; Doc. 138 Ex. D-10 at 8.) Again, this appears to be a disagreement between a patient and a

healthcare provider as to the proper course of treatment, which is not actionable under the Eighth

Amendment. *Phillips*, 508 F. App'x at 746. Even though it appears that Kirk will be receiving a

CT scan in the near future (*see* Doc. 150 at 4), the refusal of Flores to order one could constitute

medical malpractice—negligence—at most, not an Eighth Amendment violation. *See Sanaah*,

384 F. App'x at 741.

Thus, upon a thorough examination of the evidence, viewed in the light most favorable to

Kirk, I find that Kirk has not shown the violation of a constitutional right, and Flores is therefore

entitled to qualified immunity. I recommend that the Court grant summary judgment in favor of

Flores and dismiss Kirk's claims.

### III.    Kirk's Motions to Compel, Provide Documents, and Set Trial Dates

Kirk filed a Motion to Compel/Consent Order. (Doc. 126.) First, he asks the Court to

order Flores to provide documents evidencing that he is actually a doctor and not a Certified

Nurse Practitioner, as Kirk believes that Flores is skirting his legal obligations by claiming a lesser certification. I recommend that the Court deny this request as frivolous because the Eighth Amendment standard for deliberate indifference to serious medical needs is the same whether a defendant is a prison doctor or a prison guard—or, as here, a certified nurse practitioner. *See Estelle*, 429 U.S. at 104-05. Kirk also requests that Flores provide all documents reflective of any insurance policies he may have that would cover legal expenses, including a judgment against him. Because I recommend that the Court grant summary judgment in Flores's favor and dismiss Kirk's claims, I recommend that the Court deny this request as moot.

Kirk also filed a Motion to Provide Documents/Evidence. (Doc. 127.) First, Kirk requests police dispatch records. I recommend that the Court deny this request as moot because Burke's *Martinez* report already included redacted dispatch records (*see* Doc. 110 Ex. A at 19-22), and Kirk himself included a more complete dispatch record in a later filing (*see* Doc. 137 at 6-13). Kirk also requests dashcam video and audio including but not limited to Burke's dashcam, which has been filed as well. (*See* Doc. 112 Ex. B.) I therefore recommend that the Court deny this request as moot. Finally, Kirk requests a sworn affidavit from Agent David Hoy regarding his knowledge of the October 26, 2010, incident and October 24, 2010, tactical plan. Kirk asserts that officers conspired against him on October 24, 2010, and then slandered him with charges on October 26, 2010. He submits what appears to be a use of force policy, followed by an arrest warrant operation spreadsheet, listing Lopez, Burke, and Hoy. (Doc. 127 at 3-4.) I recommend that the Court deny this request for two reasons. First, the Court already ordered, and Burke submitted, incident reports and/or affidavits from the officers involved in the incident. (*See* Doc. 83 at 5.) Second, the scope of discovery is limited to relevant information.  *See* FED. R. CIV. P. 26(b)(1). There is no indication from the document submitted by Kirk that the use of force policy

and arrest warrant operation had anything to do with Kirk, much less a conspiracy against him. Nor does Agent Hoy appear in the *Martinez* report.

Finally, Kirk filed a Motion Requesting Settlements And/or Trials: Set Trial Dates. (Doc. 153.) He moves for a trial setting while suggesting that Burke and Flores may meet with him to discuss "a specific dollar amount." As noted in a previous order to submit a *Martinez* report, the Court may use the *Martinez* report when deciding whether to grant summary judgment, either on motion or *sua sponte*. *See Hall*, 935 F.2d at 1109-13; *see also Celotex Corp.*, 477 U.S. at 326 (noting that district courts have the power to enter summary judgment *sua sponte*, as long as the opposing party was on notice that she had to come forward with all her evidence). As requested by the Defendants, I have treated the *Martinez* reports as motions for summary judgment. Because I recommend that the Court grant Defendants' motions for summary judgment and dismiss all claims, I recommend that the Court deny this motion as moot.

## CONCLUSION

I conclude that Kirk has failed to show that either Burke or Flores violated a constitutional right, and Burke and Flores are therefore entitled to qualified immunity. I recommend that the Court grant Defendants' motions for summary judgment and dismiss the claims against them with prejudice. I also recommend that the Court deny Kirk's Motion to Compel/Consent Order, his Motion to Provide Documents/Evidence, and his Motion Requesting Settlements And/or Trials: Set Trial Dates.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.